UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| STANLI MAE THROCKMORTON TERBUSH, et al., | ) | 1:02-CV-5509-SMS |
| | ) | |
| | ) | ORDER GRANTING DEFENDANT'S MOTION |
| Plaintiffs, | ) | TO DISMISS FOR LACK OF SUBJECT |
| v. | ) | MATTER JURISDICTION PURSUANT TO |
| | ) | FED. R. CIV. P. 12(b)(1) (DOC. |
| UNITED STATES OF AMERICA, | ) | 36) |
| | ) | |
| Defendant. | ) | ORDER DENYING PLAINTIFFS' REQUEST |
| | ) | TO AMEND THE PLEADINGS |
| | ) | |

ORDER DECLARING DEFENDANT'S
ALTERNATIVE MOTION FOR SUMMARY
JUDGMENT OR SUMMARY ADJUDICATION
MOOT (DOC. 36)

ORDER DIRECTING THE CLERK TO
DISMISS THIS ACTION

Plaintiffs are proceeding with a civil action in this Court.
The matter has been referred to the Magistrate Judge for all
proceedings, including the entry of final judgment, pursuant to
28 U.S.C. § 636(c), Fed. R. Civ. P. 73(b), and Local Rule 73-301.

The motion of Defendant United States to dismiss the action,
or in the alternative for summary judgment or summary
adjudication, came on regularly for hearing on December 2, 2005,
at 9:26 a.m. in Courtroom 4 before the Honorable Sandra M.
Snyder, United States Magistrate Judge. Kristi Culver Kapetan of

1

1  the United States Attorney's Office appeared on behalf of the
2  moving Defendant, and John Barr and William Davis appeared on
3  behalf of Plaintiffs. The Court had reviewed all the papers
4  submitted in support of, and in opposition to, the motion. After
5  argument, the matter was submitted to the Court.

6       I. <u>Background</u>

7       On May 3, 2002, Plaintiffs, who are the parents, heirs at
8  law, and successors in interest of decedent Peter Terbush,
9  brought this action pursuant to the Federal Tort Claims Act,
10 alleging that Defendant United States of America (USA) operated
11 Yosemite National Park (YNP) where, on June 13, 1999, decedent
12 was killed by a rockslide at or near the base of Glacier Point.
13 Plaintiffs allege that 1) USA was negligent: USA negligently
14 designed, constructed, operated, and maintained a wastewater
15 drainage system and leach field on the premises that caused water
16 to flow into fractures in rock formations, which unnaturally
17 stressed the rock, causing increased rock-fall (exfoliation)
18 activity and a dangerous condition, which in turn caused a
19 rockslide; USA knew or should have known of the condition and
20 failed to post necessary warning signs to warn of the danger,
21 which was not reasonably apparent. Plaintiffs further allege that
22 2) the site was a dangerous condition of the premises resulting
23 from destabilization from the flow of wastewater, and USA should
24 have warned of the danger. (Complt.)

25      USA filed an answer on July 15, 2002, denying many
26 allegations, asserting that at the time of death decedent was on
27 a talus pile 240 feet above the base of Glacier Point, and
28 further asserting defenses including lack of subject matter

jurisdiction, failure to state a claim, lack of waiver of
sovereign immunity, due care, lack of proximate cause,
contributory fault, and assumption of risk.

On May 16, 2005, Defendant USA filed a motion to dismiss the
action pursuant to Fed. R. Civ. P. 12(b)(1), or, in the
alternative, a motion for summary judgment pursuant to Rule 56,
on the ground that the Court lacks subject matter jurisdiction
over this action for negligence pursuant to the discretionary
function exception to the Federal Tort Claims Act (FTCA), or,
alternatively, Plaintiffs cannot establish a claim for negligence
against the government because of the discretionary function
exception; further, Defendant argues that Plaintiff is not
entitled to recover because he assumed the risk of injury when he
engaged in the sport of rock climbing in YNP. Also filed were a
statement of undisputed facts, declaration of Kristi Kapetan with
Ex. A thereto, declaration of Michael J. Tollefson with Exhibits
A through E, declaration of Sherrod Osbourne with Ex. A in three
parts, and the declaration of John Williamson.

Defendant argues that the decisions the National Park
Service (NPS) made about placement of YNP facilities, rock fall,
and warnings are immunized by the discretionary function
exception to the FTCA; further, decedent assumed the risk of
rocks falling on him when he engaged in technical rock climbing,
and thus he assumed the risk of injury when he engaged in that
hazardous activity.

On June 17, 2005, Plaintiffs filed a memorandum in
opposition, statement of disputed and undisputed facts,
objections to Defendant's statements of facts, and declarations,

with exhibits, of Catherine Crabtree, Chester F. Watts, Fred A. Brooks, and decedent's climbing companions, Joseph Kewin and Kerry Pyle.

Plaintiffs assert that various policies applicable here were mandatory, nondiscretionary policies regarding inspections, engineering reviews, and signing or informing the public regarding known hazards, especially those created or exacerbated by NPS construction activities that rendered the rock face ultra-hazardous to climbers and the general public who picnic, hike, or birdwatch at Glacier Point. Even though some discretionary decisions may have been made at some point about the wastewater facility, the manner in which it was operated or maintained was removed from the discretionary function exception. Plaintiffs assert that the discretionary function exception does not apply and that the Court does have jurisdiction over the matter. Further, Plaintiffs seek leave to amend their pleadings to conform to proof and resolve any issues that arise from the pleadings' statement of the case which can be cured by amendment. (Pltf.'s Points and Authorities in Opposition at 23.)

On July 1, 2005, Defendant filed a reply, objections to Plaintiff's evidence, responses to Plaintiff's objections to Defendant's evidence, statement of facts in reply (referred to herein as "factual reply"), declaration of Lloyd Olson, and declaration of Kristi Kapetan with exhibits.

On August 9, 2005, Plaintiffs filed a supplemental brief in opposition to the motion, and portions of the NPS-50 document, which Plaintiffs contend makes OSHA compliance, policies, and mandates applicable to Defendant's conduct at issue in this case.

4

1    On August 23, 2005, pursuant to the Court's order, Defendant
2  filed a supplemental brief and a complete copy of the NPS-50
3  document.

4    On September 8, 2005, Plaintiffs filed a response to
5  Defendant's supplemental briefing.

6    II. <u>Governing Standards</u>

7        A. <u>Motion to Dismiss</u>

8    It has been held that a motion to dismiss on the basis of
9  the discretionary function exception is a motion to dismiss for
10 lack of subject matter jurisdiction pursuant to Rule 12(b)(1).
11 <u>McCarthy v. United States</u>, 850 F.2d 558, 560 (1988),
12 <u>cert.</u> <u>denied</u>, 489 U.S. 1052 (1989). The presence or absence of
13 subject matter jurisdiction of a federal court is a question of
14 law. <u>Id.</u>

15   Except in removed cases, it is in effect presumed that the
16 Court lacks jurisdiction, and it is the plaintiff who bears the
17 burden of proof of establishing subject matter jurisdiction.
18 <u>Kokkonen v. Guardian Life Ins. Co. of America</u>, 511 U.S. 375, 377
19 (1994); <u>Stock West, Inc. v. Confederated Tribes of the Colville</u>
20 <u>Reservation</u>, 873 F.2d 1221, 1225 (9th Cir. 1989); <u>Valdez v. United</u>
21 <u>States</u> 837 F.Supp. 1065, 1067, <u>aff'd.</u>, <u>Valdez v. United States</u>,
22 56 F.3d 1177 (9th Cir. 1995). However, it is the government's
23 burden to demonstrate the applicability of the discretionary
24 function exception. <u>Whisnant v. United States</u>, 400 F.3d 1177,
25 1181 (9th Cir. 2005).

26   Challenges to jurisdiction by way of Rule 12(b)(1) may
27 proceed on the basis of the face of the complaint, or on the
28 basis of evidence beyond the complaint. When proceeding on the

1 basis of the face of the complaint, the Court must accept all of

2 the factual allegations of the complaint as true and ask whether

3 the allegations state a claim sufficient to survive a motion to

4 dismiss. United States v. Gaubert, 499 U.S. 315, 327 (1991);

5 Berkovitz v.United States, 486 U.S. 531, 540 (1988).

6       However, when considering a motion to dismiss pursuant to

7 Rule 12(b)(1), the district court is not restricted to the face

8 of the pleadings, but may review any evidence, such as affidavits

9 and testimony, and may weigh the evidence and resolve and

10 determine factual disputes concerning the existence of

11 jurisdiction; this consideration of evidence does not convert the

12 motion into a motion for summary judgment. McCarthy v. United

13 States, 850 F.2d 558, 560 (9th Cir. 1988). Under such

14 circumstances, no presumptive truthfulness attaches to the

15 plaintiff's allegations. Roberts v. Corrothers, 812 F.2d 1173,

16 1177 (9th Cir. 1987).[1]

17       The allegations of the complaint define the type of

18 negligence that is to be evaluated by the Court. Whisnant v.

19 United States, 400 F.3d 1177, 1184-85 (9th Cir. 2005).

20       Under limited circumstances, where the attack is on the face

21 of the pleadings, a court may grant leave to amend a complaint to

22 remedy jurisdictional allegations that are defective as to form.

23 Telluride Management Solutions, Inc. v. Telluride Investment

24

---

25       [1]Nevertheless, where the facts upon which jurisdiction depends are also an essential element of the federal
26 claim, the challenge to the facts goes both to federal jurisdiction (which is otherwise always a question of law for the
   Court) and to the merits of the claim. The Court should not resolve genuinely disputed facts where the question of
27 jurisdiction is dependent on the resolution of factual issues going to the merits. Roberts v. Corrothers, 812 F.2d
   1173, 1177 (9th Cir. 1987). In such a case, the district court assumes the truth of factual allegations in a complaint
28 unless controverted by undisputed facts in the record. Dismissal is then appropriate where it appears beyond doubt
   that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Id.

1  <u>Group</u>, 55 F.3d 463, 466 (9th Cir. 1995) (abrogated on other

2  grounds, <u>Cunningham v. Hamilton County</u>, 527 U.S. 198 (1999)).

3  Plaintiffs request leave to amend their pleadings to conform to

4  proof and resolve any issues that arise from the pleadings'

5  statement of the case which can be cured by amendment.

6       When established governmental policy, as expressed or

7  implied by statute, regulation, or agency guidelines, allows a

8  government agent to exercise discretion, it must be presumed that

9  the agent's acts are grounded in policy when exercising that

10 discretion. <u>Gaubert</u>, 499 U.S. at 324. For a complaint to survive

11 a motion to dismiss, it must allege facts which would support a

12 finding that the challenged actions are not the kind of conduct

13 that can be said to be grounded in the policy of the regulatory

14 regime. <u>Id.</u> at 324-35.

15           B. <u>Summary Judgment</u>

16      Although the plaintiff bears the initial burden of proving

17 subject matter jurisdiction under the FTCA, the government bears

18 the ultimate burden of proving the applicability of the

19 discretionary function exception. <u>Faber v. United States</u>, 56 F.3d

20 1122, 1124 (9th Cir. 1995). The plaintiff bears the burden of

21 coming forth with sufficient evidence to establish that there are

22 genuine issues of material fact regarding the applicability of

23 the discretionary function exception, but the government bears

24 the burden of establishing that the test is met and that the

25 discretionary immunity applies. <u>Miller v. United States</u>, 163 F.3d

26 591, 594 (9th Cir. 1998).

27      III. <u>Facts</u>

28      Decedent, Joseph Kewin, and Kerry Pyle met in the Curry

                              7

Village parking lot and decided to do a quick climb at the end of
the day on June 13, 1999. (Decl. of Pyle at 1.) Neither Kewin nor
Pyle saw any warnings at Curry Village, in the Mountain Shop, in
Sunnyside/Camp 4 where they stayed, or along the trail to alert
them to increased rock fall hazard in the area of Curry Village
or the Glacier Point Apron. (Decls.) Kewin was not aware of the
rock fall of May 25, 1999. Kewin said they probably would not
have climbed if there had been a cyclone fence or warning signs,
and they would have relied on the park to notify them of a danger
of a huge rock fall. Pyle confirmed that they would not have
climbed if they had seen any warning signs of a dangerous
condition or if the area had been roped off; they would have
expected a warning. (Decls.)

The precise location of decedent, and whether or not he was
in a wilderness zone, at the time of his death are disputed.
Evidence submitted by the parties warrants conflicting
inferences.

Defendant makes a continuing relevance objection regarding
facts concerning the presence and knowledge of a rock fall hazard
in the area. The events will be recited because they bear upon
the appropriateness of an inference regarding the presence or
absence of safety concerns and the nature and extent of
Defendant's response to rock fall hazards.

It is undisputed that the General Management Policies (GMP
1980) for NYP issued in 1980 identify 83 tent cabins, including
employee housing, in the Curry Village area that are in a rock
fall hazard area. (Deft.'s Factual Reply at 21.) However, it is
unclear exactly how close that area was to the area at which

1  decedent was killed.

2  Tollefson, superintendent of YNP since January 2003, with
3  thirty years of NPS experience and twenty years of experience as
4  a superintendent or operations director for various locations in
5  the NPS, recites data in the 2004 rock fall policy and 2000
6  Yosemite Valley Plan to the effect that because of the angle of
7  the cliffs in Yosemite, rock fall is an inevitable geologic
8  hazard in the park, and indeed, reports have issued (USGS 1992
9  and 1998) and mapping of geologic hazard zones in Yosemite Valley
10 has occurred; however, the location and timing of rock falls are
11 rarely predictable. (Tollefson Decl., Exs. D and E , YVP, App.
12 C.)

13 Evidence from Dr. Watts, a geologist, tends to show rock
14 falls are not unpredictable as claimed by NPS and are in fact
15 predictable to a great extent by scientific analysis of the rock
16 formations and conditions, including investigation of the impacts
17 of construction and water management practices on or in the
18 vicinity of the rock walls; further, rock fall often begets rock
19 fall, so the fact of recent rock fall activity in an area is
20 important predictive information. (At 10.) In Watts' opinion,
21 YNP's operation of its wastewater facility above Glacier Point
22 exacerbated the naturally occurring exfoliative process on the
23 face of Glacier Point dominant rock and significantly increased
24 the risk of harm from falling rocks and the risk of major rock
25 fall in the area where decedent was killed. He further opines,
26 without identifying precise standards, that making any kind of
27 changes to topography, drainage, or water uses on Glacier Point
28 without carefully considering the potential effects on visitors

at Curry Village directly below the huge cliffs is irresponsible from a scientific and engineering point of view; and Defendant failed to observe appropriate standards in declaring Curry Village-Glacier Point safe after the May 1999 rock fall. Evidence from geologist Gerald F. Wieczorek, a geologist with the U.S. Geological Survey who studied and followed rock falls in YNP beginning in 1980, shows that previous rock slides had been mapped in March 1999.

Fred A. Brooks, a professor of park management for over fifteen years who managed developed recreation resources on Lassen National Forest for twenty years until 2004, sets forth evidence tending to show that the path which led to the site of decedent's death was not in wilderness territory given its well-worn and populated character.[2]

Much of the evidence attached to the declaration of Crabtree is objected to as hearsay, lacking an adequate foundation, or irrelevant. However, with respect to the depositions referred to in Crabtree's declaration, Crabtree states that she is custodian of records, and that the copies are true and correct copies of deposition excerpts received in the ordinary course of business and maintained for litigation. Further, Defendant has submitted copies of the deposition testimony of James B. Snyder and Gerald F. Wieczorek as a courtesy.[3] Thus, the deposition testimony appears to be admissible. The evidence introduced warrants an

---

[2] Defendant correctly objects that the evidence regarding what members of the public would have thought or expected regarding the safety of the area, and whether warnings should have been given, is speculative and inadmissible opinion.

[3] The Court generally will not review portions of the depositions absent direction by a party with an appropriate citation.

1 inference that there had been earlier rock slides, including a
2 rock slide in May 1999, which had resulted in a temporary warning
3 to persons in the area and then a reopening of the area at the
4 foot of Glacier Point.

5     Although the information purported to have been written by
6 Richard Duane in 1998 on the bigwalls.net website is not
7 sufficiently authenticated, and thus Defendant's objection to its
8 admissibility is sustained,[4] other evidence warrants an inference
9 that the camp where decedent was staying was a Mecca for rock
10 climbers, and at the mountain shop located near the rock face
11 where decedent was killed, rock climbing gear, maps, and guides
12 were sold. Although the precise concession arrangements are
13 unclear, the evidence tends to show that rock climbing commonly
14 occurred at Glacier Point. Further, Defendant does not dispute
15 that climbers throughout the world consider Yosemite to be a
16 premier rock climbing venue, and that Sunnyside/Camp 4, where
17 decedent stayed, is the historic Mecca for climbers in the
18 Yosemite Valley that is now on the National Register of Historic
19 Places. It is likewise undisputed that there were no signs or
20 other posted warnings at the time to indicate any risk, unusually
21 increased or not, of rock fall in the area where decedent was
22 killed. Dr. Wieczorek had seen signs warning of rock fall in the
23 area on the trail up towards Nevada Falls after a recent rock

24

25     [4]Information on internet sites presents special problems of authentication. A proponent should be able to
26 show that the information was posted by the organization/s to which it is attributed. See Wady v. Provident Life and Accident Insurance Co. of America, 216 F.Supp.2d 1060, 1064-65 (C.D.Cal. 2002); but see Moose Creek, Inc. v.
27 Abercrombie & Fitch Co., 331 F.Supp.2d 1214, 1224-5 (C.D.Cal. 2004). It has been recognized that anyone with sufficient hacking ability can put anything on the internet; no web-site is monitored for accuracy, and nothing
28 contained therein is subject to independent verification absent underlying documentation. Wady v. Provident Life and Accident Insurance Co. of America, 216 F.Supp.2d at 1064-65.

1  fall; he had never seen any general identifications of where rock
2  fall hazards were made public within the park.

3      Plaintiffs have provided evidence warranting an inference
4  that a dangerous condition existed at the rock face at Glacier
5  Point and that Defendants knew of the dangerous condition,
6  although the precise imminence of the danger, or any knowledge or
7  understanding thereof, appears to be disputed. It is undisputed
8  that two sizeable rock falls had occurred in November 1998 and
9  May 1999 in the Glacier Point area. Defendant does not dispute
10 that 44 per cent of the injuries caused by rock fall in YNP
11 between 1860 to 2003 have occurred on Glacier Point rim, which
12 amounts to less than 20 per cent of the rim of YNP. Wiekzorek
13 testified that Camp Curry was in the rock fall area below Glacier
14 Point; he had surveyed it and published an inventory map in 1992.
15 Watts notified the head of the park service of his concern that
16 the wastewater had increased the risk of rock fall.

17     It is undisputed that following the May 25, 1999 rock fall,
18 YNP staff erected warning signs and closed areas of the Curry
19 Village campground and the Glacier Point Apron area where
20 decedent was later killed; the incident inspection was
21 accomplished and the closure lifted less than three hours after
22 the May 1999 rock fall, and the area was declared to be safe. It
23 is undisputed that Snyder, who had no formal training as a
24 geologist but had extensive professional experience with rock
25 falls in Yosemite, was one of two individuals who declared the
26 area "safe," and the other was a park ranger.

27     Watts declared that the NPS failed to follow through with
28 accepted professional standards of engineering, geological

1 practice, and geological scientific evaluation of hazards in

2 declaring the Glacier Point-Curry Village area safe after the May

3 1999 rock fall, and it failed to create a suitable monitoring and

4 warning system for impending danger to visitors as required by

5 the 1993 RMP. Watts communicated his research findings regarding

6 the effects of the Glacier Point wastewater management as a

7 potential cause for rock fall to Director of NPS Stanton before

8 the rock fall that caused decedent's death.

9     Lloyd Olson declared that he was the park safety officer

10 from December 1996 through August 1999. He says nothing about any

11 duties relating to visitor or public safety, but rather confines

12 his declaration to his duties regarding managing the safety and

13 occupational health program for federal employees located in the

14 park. He stated that injuries and fatalities to visitors were

15 managed and investigated by law enforcement personnel in the

16 visitor and resource protection unit. (Decl. at 1-2.) It is

17 undisputed that no park safety officer was identified in the

18 staff positions listed for the incident investigation and

19 reporting team regarding the incident that resulted in decedent's

20 death.

21     IV. <u>The Discretionary Function Exception to Waiver of
         Sovereign Immunity</u>

22

23     The Federal Tort Claims Act (FTCA) waives sovereign immunity

24 of the federal government when its employees are negligent within

25 the scope of their employment with the aim to establish

26 consistency between liability incurred by individuals and by the

27 government for the commission of tortious acts. The FTCA permits

28 the United States to be sued under circumstances where it, if a

private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b)(1); <u>Faber v. United States</u>, 56 F.3d 1122, 1124 (9th Cir. 1995) (citing 28 U.S.C. § 1346(b)).

The FTCA waives the federal government's immunity from suit for tort claims in the same manner and to the same extent as a private individual under like circumstances. 28 U.S.C. § 2674. It is a statute intended to compensate individuals harmed by government negligence; it is a remedial statute that should be construed liberally, and its exceptions should be read narrowly. <u>O'Toole v. United States of America</u>, 295 F.3d 1029, 1037 (9th Cir. 2002). Where an exception to the FTCA applies, the United States has elected not to waive its immunity from suit, and courts are without jurisdiction over such claims. <u>O'Toole</u>, 295 F.3d at 1033.

Title 28 U.S.C. § 2680(a) provides for an exception to the limited waiver of sovereign immunity of the Federal Tort Claims Act (FTCA):

> The provisions of this chapter and section 1346(b) of this title shall not apply to–
>
> > (a) Any claim based upon an act or omission of an employee of the Government... based upon the exercise or performance or the failure to exercise or perform a discretionary function or a duty on the part of a federal agency or or an employee of the Government, whether or not the discretion involved be abused.

The purpose of this exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policies through the medium of an action in tort. <u>Berkovitz by Berkovitz v. United States</u>, 486 U.S. 531, 536-37 (1988) (holding that action based on a failure to

1  follow standards for vaccine testing and adoption was not barred
2  by the exception). To determine the scope of the exception, it is
3  necessary to consider the nature of the conduct, as distinct from
4  the status of the actor; the conduct challenged by the suit must
5  be a matter of judgment or choice for the acting employee, and
6  thus cannot involve a statute, regulation, or policy that
7  specifically prescribes a course of action for an employee to
8  follow. Id. at 537. Further, only governmental actions and
9  decisions based on considerations of public policy are protected.
10 Id.

11    The steps to follow in determining the applicability of the
12 discretionary function exception to the waiver of sovereign
13 immunity are to determine 1) whether the challenged actions were
14 discretionary or instead controlled by mandatory statutes or
15 regulations or other bases of precise formulations. In
16 determining the first step, it must be determined if a federal
17 statute, regulation, or policy specifically prescribes a course
18 of action that was not followed. Berkovitz v. United States, 486
19 U.S. 531, 536 (1988). There can be no exercise of discretion
20 where an agency or agent has no rightful option but to adhere to
21 a directive. Id. If there is no choice, then there is no
22 immunity.

23    However, if the actor has choice as to appropriate conduct,
24 then it must be determined 2) whether the conduct involves policy
25 judgment, that is, judgments regarding the application of social,
26 economic, or political policies or purposes of the overarching
27 enactments, enterprises, or actions in question. United States v.
28 Gaubert, 499 U.S. 315, 328-29, 332. With respect to the second

step, the actions of government agents involving choice grounded
in social, economic, or political goals are protected. The
general aims and policies of a controlling statute or enactment
pertinent to the analysis are usually evident from the text.
Gaubert, 499 U.S. at 323-24. Some agencies establish policy on a
case-by-case basis. Id. at 324. The focus of the inquiry is the
nature of the actions taken and whether they are susceptible to
policy analysis. Id. at 325.

    In Gaubert, the court rejected the position that once
actions of a federal bank board became operational or managerial
decisions that were routine or frequent, they were no longer
policy-oriented; it held that discretionary day-to-day decisions
regarding mergers, choice of management, and financing were
discretionary because the actors were given the power to exercise
judgment; further, they were policy-oriented because they
involved application of policies of protecting solvency and
assets, maintaining confidence in the industry, and overseeing
the industry. Id. at 330-34.

    When established governmental policy, as expressed or
implied by statute, regulation, or agency guidelines, allows a
government agent to exercise discretion, it must be presumed that
the agent's acts are grounded in policy when exercising that
discretion. Gaubert, 499 U.S. at 324. For a complaint to survive
a motion to dismiss, it must allege facts which would support a
finding that the challenged actions are not the kind of conduct
that can be said to be grounded in the policy of the regulatory
regime. Id. at 324-35. The presence of some standards by which an
employee or agency is to act does not necessarily render an

1  action not discretionary. <u>See</u> <u>United States v. Varig Airlines</u>,
2  467 U.S. 797 (1984). Likewise, the mere fact that acts are
3  regulatory or governmental in nature does not render them
4  discretionary policy conduct. <u>Berkovitz</u>, 486 U.S. at 538-39.

5       V. <u>Analysis of the Present Action</u>

6       State tort law governs tort actions against the federal
7  government. <u>Jones v. United States</u>, 693 F.2d 1299, 1301 (9th Cir.
8  1982).

9       With respect to the discretionary function exception, the
10 Court must consider the allegations of the complaint regarding
11 <u>how</u> the government is alleged to have been negligent; the type of
12 negligence alleged is critical. <u>Whisnant v. United States</u>, 400
13 F.3d 1177, 1184-85 (9th Cir. 2005).

14      A. <u>The Complaint</u>

15      In the first claim (negligence), it is alleged that
16 Defendant negligently caused a dangerous wastewater system,
17 including a drainage system and leach field, that was negligently
18 designed, situated, constructed, operated, maintained, and
19 supervised) to exist, to remain, and not to be remedied on its
20 premises; this exposed persons near the site to an unreasonable
21 risk of harm asnd directly caused the rock fall that caused
22 decedent's death. (Complt. at 3-5.) Warning signs were necessary
23 because the condition was not reasonably apparent to reasonable
24 persons exercising due care, and Defendant negligently failed to
25 post warning signs on the premises despite increased rock fall
26 activity. (<u>Id.</u> at 4-5.) Defendant knew or should have known that
27 its negligence would increase the frequency and mass of rock
28 slides in the area of the wastewater facility that would cause

17

1 injury or death to people present. (Id. at 5.)

2     In the second claim (dangerous condition of premises), it
3 was alleged that Defendant's aforementioned negligence in
4 constructing and operating the wastewater system created a
5 dangerous condition in the nature of excess water causing
6 exacerbation of the naturally occurring exfoliation process of
7 the rock, which in turn destabilized the cliffs and walls and
8 caused more frequent and more catastrophic rock slides such that
9 warning signs were necessary with respect to persons present
10 exercising due care; however, Defendant failed to post warning
11 signs; the dangerous condition caused Plaintiffs' decedent's
12 death.

13     Under California law a possessor of land must act as a
14 reasonable person in the management of the property in view of
15 the probability of injury to others and all pertinent
16 circumstances; where the occupier of land is aware of a concealed
17 condition involving in the absence of precautions an unreasonable
18 risk of harm to those coming in contact with it and is aware that
19 a person on the premises is about to come in contact with it, the
20 trier of fact can reasonably conclude that a failure to warn or
21 repair the condition constitutes negligence. Rowland v.
22 Christian, 69 Cal.2d 108, 119 (1968). In California, it is
23 recognized that a possessor of land has a duty to exercise
24 ordinary care to keep premises in reasonably safe condition, 6
25 Witkin, Summary of California Law, 10th ed. 2005, § 1119,
26 including an affirmative duty to inspect premises, id. at § 1120.

27          B. Discretionary or Mandatory Policy

28     Plaintiffs argue essentially that NPS-50 chapters 5 and 22,

18

the 1993 RMP, and the 1988 MP render the recreational experience
protected for the visitor. NPS-50 policies, OSHA, and Executive
Order 12196 render it protected for employees. The two schemes or
protections interlink for both visitors and employees to provide
a safe workplace and safe recreational venue.

Most of the policies relied on by Plaintiffs have been
interpreted not to constitute mandatory, specific policies which
require particular action on the part of governmental agents.

### 1. 16 U.S.C. § 1

Michael J. Tollefson, Superintendent of YNP since January
2003, superintendent and director of other national parks since
1983, and a National Park Service (NPS) employee since 1973, made
a declaration on the basis of his review of documents kept by
persons in the ordinary course of business at or near the time of
occurrence by persons with actual knowledge of the events
recorded. (Tollefson Decl. at 1.) Superintendents of national
parks are responsible for making policy decisions regarding
management of their parks in the context of the purposes of the
NPS as stated in the Organic Act, 16 U.S.C. § 1, namely, to
"conserve the scenery and the natural and historic objects and
wild life of the national parks and to provide for the enjoyment
of the same in such manner and by such means as will leave them
unimpaired for the enjoyment of future generations." (Id. at 2.)

The statute is a broad, over-arching statement of policy
that frames the activities of management of the national parks.

### 2. Unwritten Rock Fall Policy

Tollefson states that at the time of decedent's death on
June 13, 1999, there was no written policy regarding rock fall

1  warnings and closures in Yosemite Valley, but the current policy,
2  adopted February 2004, documents the unwritten policy that had
3  been in effect at YNP for decades wherein YNP staff evaluates
4  rock fall release areas and impact zones to determine whether or
5  not rock fall is imminent and what, if any, closures or warnings
6  should be issued or areas closed. (Decl. at 2, referring to
7  Decl., Ex. A.) Plaintiffs object that this evidence is not
8  relevant and is unfounded hearsay or lay opinion. The 2004 policy
9  is relevant only if it does embody the policy at the time of
10 decedent's death; there is no showing that Tollefson had personal
11 knowledge of what any unwritten policy was in 1999, although he
12 stated that he reviewed documents and pertinent business records,
13 and thus there is a basis for his knowing that there was no
14 previous written policy. Beyond that, his knowledge is unclear.
15 Contrary to Defendant's assertion, the mere fact that he signed
16 or authored or possibly drafted the new policy does not mean that
17 he has personal knowledge of what the previous "unwritten" policy
18 was.

19     The 2004 written policy establishes what appears to be a
20 discretionary policy; considerable discretion on the part of
21 staff would exist under it to evaluate the weight of geologic
22 evidence to ascertain if it was sufficiently compelling and
23 clear. The policy states that rock fall in Yosemite Valley is
24 inevitable but rarely predictable as to time and location; thus,
25 it is managed on a case-by-case basis; the policy is not to post
26 warning signs or implement area closures for rock fall along or
27 beneath cliff faces of Yosemite Valley or in designated
28 wilderness or any other locations except when compelling geologic

1  evidence presents itself with sufficient clarity to lead park
2  staff to an informed conclusion that rock fall is imminent.
3  Warnings will be posted along improved road and improved trail
4  network and other improved areas such as areas containing lodging
5  facilities, restaurants, residential zones, and other built
6  environments intended for public gatherings; the warning will be
7  in English and in a format consistent with the area and threat to
8  effectively communicate the hazard. In cases other than those,
9  such as on unofficial trails or climbing routes, the NPS will
10 post warning on bulletin boards at Camp 4, Camp Curry Mountain
11 Shop, and other stated locations if staff ascertains that rock
12 fall is imminent. Any closures based on park staff conclusions
13 that rock fall is imminent will be implemented pursuant to the
14 regulations contained in Title 36, Part 1, CFR. (Decl. of
15 Tollefson, Ex. A.)

16     Plaintiffs dispute that this unwritten policy governed,
17 citing to the 1988 NPS Management Policies, which were in effect
18 at the time of death and which prohibited unwritten policies,
19 stating:

20     All policy will be articulated in writing, approved
       by an NPS official authorized to issue the policy,
21     and published or otherwise made available to those
       whom it affects and those who must implement it
22     in the Washington office, regional offices, and
       parks. Unwritten or informal "policy" and people's
23     various understandings of NPS traditional practices will
       not be relied on as official policy.
24
25 (Brooks Decl, ¶ 6, Ex. A, Foreword at ix.)

26     The overarching statute, 16 U.S.C. § 1, charges the NPS with
27 promoting and regulating the use of the national parks by means
28 which conform to the fundamental purposes of the parks, which is

1  conservation of scenery, natural objects, and wildlife as well as
2  enjoyment thereof in a manner and by such means that will leave
3  them unimpaired for future generations. This is interpreted as
4  requiring a balancing of preservation and public access, which in
5  turn requires judgment and choice by the NPS about what sorts of
6  facilities and safety features, if any, to provide. <u>Childers v.</u>
7  <u>United States</u>, 40 F.3d 973, 974 (9th Cir. 1995). In the present
8  case, the declaration of YNP Superintendent Tollefson establishes
9  that superintendents make policy decisions regarding the
10 management of their parks in the context of these purposes.

11      However, as to Defendant's contention that the specific 2004
12 policy existed in unwritten form, the Department of the
13 Interior's 1988 NPS Management Policies (1988 MP) provided that
14 all policy would be articulated in writing, approved by an
15 authorized official, and published or made available to those
16 affected; further, it expressly stated that unwritten or informal
17 policy and understandings of NPS traditional practices would not
18 be relied on as official policy. (Brooks Decl., ¶ 6, Ex. A,
19 Foreword at ix.)

20      The Court concludes that the government has not established
21 that the 2004 Rock Fall Policy was in effect at the time of
22 decedent's death.

23              3. <u>1988 Management Policies (1988 MP) re: Signs</u>
24      Tollefson declares that the 1988 MP are a set of policy
25 directives for NPS managers covering a broad spectrum of issues.
26 (Decl. at 3.)

27      The 1988 MP provide that the use of signs is particularly
28 limited in wilderness areas because they detract from the

wilderness character of an area; it would violate the NPS non-proliferation of signs policy for the NPS to install signs along the base of all the cliffs surrounding Yosemite Valley. (Decl. at 3.) Reference to the 1988 MP (Tollefson Decl., Ex. C) reveals that where a wilderness area is designated, preservation of wilderness character and resources becomes an additional statutory purpose of the park, and that preservation while providing for appropriate use is the primary management responsibility (other than activities related to the saving of human life), and is to be carried out by the directors and superintendents of the parks, and the latter shall develop and maintain a wilderness management plan. Superintendents are to select the minimum tool or administrative practice necessary to successfully and safely accomplish management objectives with the least adverse impact on wilderness character and resources.

As to signs, it is stated that signs detract from the wilderness character of an area and make the imprint of man and management more noticeable. Only those signs necessary to protect wilderness resources or for public safety, "such as signs identifying trails and distances," will be permitted. Where signs are used, they should be compatible with their surroundings and be the minimum size possible. (Id., chs. 6:3-6:6.)

Further, with respect to signs relating to visitors, the 1988 MP state that each park will have an approved park-wide sign plan establishing design criteria based on the park's unique resources and values; signs will be carefully planned to convey appropriate park image as well as information; and signs will be held to the minimum number, size, and wording required to serve

1  their intended functions so as to minimally intrude upon the
2  natural or historic setting, and will be placed where they do not
3  interfere with park visitors' enjoyment and appreciation of park
4  resources.

5      Although signs are limited, signs necessary for public
6  safety will be permitted. (Id. at 6:6.)

7      Tollefson declared that it would be a violation of the NPS
8  non-profliferation of signs policy, as well as completely futile,
9  for the NPS to install signs along the base of all the cliffs
10 surrounding Yosemite Valley stating the open and obvious fact
11 that rocks fall from the cliffs. (At ¶ 6.) He states generally
12 that the decision to provide more rock fall warning signs or to
13 close to guard the public requires a balancing of public policy
14 objectives such as resource allocation, visitor access and
15 safety, and scenic preservation. (At ¶¶ 5,6.)

16     Plaintiffs dispute this by citing NPS-50, ch. 5, and
17 asserting that these are mandatory, specific policies when there
18 is a known hazard and previous known injuries. Plaintiffs cite to
19 evidence of permanent-appearing signs along a section of road in
20 YNP warning vehicles not to stop due to rock fall hazard as well
21 as warning signs along the path to the rock face at the base of
22 Bridal Veil Falls.

23     Although Tollefson maintains that the decision to provide
24 rock fall warning signs or to close parts of the park to guard
25 the public requires a balancing of public policy objectives,
26 including resource allocation, visitor access and safety, and
27 scenic preservation (sign minimization) (at ¶¶ 5, 6), Plaintiffs
28 contend that where there are previously known injuries and a

24

1  known hazard, the government policies are mandatory and specific.

2  Defendant counters that because practically the entire park is a

3  known hazard, the decision to identify a hazard and/or post a

4  sign is one involving a balancing of policy considerations.

5      The sign policy appears to vest considerable discretion in

6  the park manager to balance resources and safety and to determine

7  when action is necessary for the public safety. Even assuming

8  that decedent was not killed in a wilderness area, it appears

9  that the sign policies recognize the value of minimal intrusion

10 of signs in natural settings and anticipate a process of

11 determining what signs are necessary for safety--a process that

12 necessarily involves the discretion of the manager or staff

13 person making determinations regarding the existence, siting, and

14 content of signs.

15      The 1988 MP provide that the saving of human life will take

16 precedence over all other management actions. (Brooks Decl., Ex.

17 A, ch. 8:5.)[5] If decedent died in a wilderness area, the 1988 MP

18 provide that within a designated wilderness area, the

19 preservation of wilderness character and resources while

20 providing for appropriate use is the primary management

21 responsibility (other than activities related to the saving of

22 human life). (Id. at ch. 6:3.) However, there is no specific,

23 mandatory direction with respect to how to determine degrees of

24 danger to human life in the context of a dangerous natural

25 setting, or what signs are necessary to public safety.

26

27      [5] Evidence in the form of a response to a RFP of November 1999 regarding comprehensive study of visitor
   safety, which refers to the NPS having previously established a management policy that puts the saving of human life

28 over all other management activities lacks foundation and authentication, is marginally relevant, and is cumulative in
   any event to the policy itself. (Crabtree Decl., Ex. E.)

1    Plaintiffs argue that the Management Policies of the United

2  States Department of the Interior, National Park Service, 1988

3  (1988 MP) are mandatory because they state that policy sets the

4  framework and provides direction for management decisions; policy

5  direction may be general or specific, may prescribe the process

6  by which decisions are made, how an action is to be accomplished,

7  or the results to be achieved; but in any event, they specify:

8        Adherence to policy will be mandatory unless waived or
         modified by an appropriate authority. Servicewide policy
9        may be waived only by the Secretary, the Assistant
         Secretary, or Director. Policy waivers and modification
10       will be considered on a case-by-case basis, and previous
         waivers or modifications will not necessarily be
11       regarded as precedents for similar waivers or modifications.

12  (Brooks Decl., Ex. A, Foreward, at ix.) It has been held that

13  even though the MP provides that adherence to NPS policy is

14  mandatory unless waived or modified, the specific policy itself

15  may nevertheless permit a degree of discretion. Blackburn v.

16  United States, 100 F.3d 1426, 1431 (9th Cir. 1996).

17       Likewise, the 1988 MP provide:

18       The saving of human life takes precedence over all
         other management actions.
19

20  (At 8.5.) However, this language, which is part of the section on

21  "Visitor Safety and Protection," is followed by a proviso that

22  park visitors assume a certain degree of risk and responsibility

23  for their own safety when visiting areas that are managed and

24  maintained as natural or recreational environments. (Id.)

25  Further, it has been held that the section on visitor safety and

26  protection is discretionary on its face because the language in

27  the section is discretionary ("will seek to provide," "strive

28  to," "efforts will be made to," and "where practicable"). Whalen

1  v. United States, 29 F.Supp.2d 1093, 1098 (D.S.D. 1998). This is

2  consistent with the understanding that a general statutory duty

3  to promote safety is not specific or mandatory. Kennewick

4  Irrigation District v. United States, 880 F.2d 1018, 1026 (9th

5  Cir. 1989). Further, although a goal or objective, such as the

6  importance or preeminence of saving of human life, may be stated,

7  if there are no specific prescriptions regarding the manner of

8  reaching the goal or specific actions required in pursuit of the

9  objective, then the policy is not mandatory and specific.

10 Childers v. United States, 40 F.3d 973, 976.[6]

11      Plaintiffs argue that the 1988 MP make the Loss Control

12 Management Program NPS-50 (1991) (NPS-50) guidelines mandatory:

13          NPS guidelines generally allow for management discretion;
           however, they are mandatory where language so indicates.
14 Management Policies at x.

15      Pursuant to these general provisions, Plaintiffs argue that

16 safety inspections, identification of recognized hazards, hazard

17 abatement planning, and notice or warnings to visitors and

18 employees in the YNP where there is a recognized hazard are all

19 mandatory.

20                      4. NPS-50

21       Plaintiffs assert that NPS Loss Control Management NPS-50

22 (NPS-50), chapter 22, in effect at the time of death, governed

23 this by providing that all park areas will provide any specific

24 materials, signs and programs to alert the public of potential

25

26

27      [6] Because these policies state only general goals, there does not appear to be any determinative significance
    to the additional provision of the 1988 MP that provides that within a designated wilderness area, preservation of
28  wilderness character and resources while providing for appropriate use is the primary management responsibility
    other than the saving of human life. (Brooks Decl., Ex. A, ch. 6:3.)

1 dangers. (Watts, Decl., ¶ 15; Tollefson Decl., Ex. D, ch 22, page
2 2, ¶ G.)

3    Tollefson declares that the NPS Loss Control Management
4 Guidelines of 1991 (NPS-50), in effect at the time of decedent's
5 death, provided some guidance regarding warnings and closures in
6 the park setting, providing for periodic inspections to identify
7 hazards and for immediate corrective action if an imminent hazard
8 is identified. (Decl. at 3, and Ex. D.) Tollefson declares that
9 NPS-50 provides for periodic inspections to identify hazards and
10 for immediate corrective action if an imminent hazard is
11 identified. (At ¶ 7.)

12    Exhibit D includes portions of chapter 22, entitled "PUBLIC
13 SAFETY AND HEALTH," which, with respect to "Program Objectives,"
14 states that it specifies the minimum program requirements for
15 protecting the visiting public from recognized hazards related to
16 Department and National Park Service "facilities or operations."
17 It states as a program requirement that the NPS region and park
18 should establish a public safety program that minimizes the
19 potential for injury, illness, death and/or property damage to
20 the public while visiting NPS facilities, including
21 identification of hazards, whereby every effort should be made to
22 identify the hazards in the park that have caused or have the
23 potential to cause injury, illness, death or property damage to
24 park visitors, considering the reasonable level of knowledge of
25 the environment possessed by most visitors in ascertaining loss-
26 producing sources. It states that a system for reporting hazards
27 should be established in each park and that employees should be
28 able to impart accurate information to the public about

28

locations, activities, climate, and special environmental threats
(earthquakes or flash floods, etc.) to allow the visitor to make
informed decisions about activities while in the park. It also
provides that with respect to educational materials, signs, and
programs, 1) all areas will provide any special materials, signs,
and programs to alert the public of potential dangers; 2)
brochures specific to the area should contain safety messages
that direct attention to special hazards or attractions that
could be potentially hazardous to the visitor (noting that
visitor centers and bulletin boards in campgrounds are an ideal
location to keep the public informed of any emergency information
or pertinent safety messages), and 3) the park safety officer
should review the signing of the park and determine if it is
appropriate for the area and in good repair. It further provides
that the park safety officer is responsible for identification of
hazards that have potential to cause injury, illness, death or
property damage to park visitors; and such officer is responsible
to assist in all investigations of public/visitor
accidents/incidents and assuring that all reports meet
requirements set forth in Chapter 6 of the NPS-50.

The foregoing provisions are general and do not appear to
mandate specific action. However, with respect to inspecting
workplaces and facilities for public hazards, and identifying
hazards in the park, it states that chapter 5 will provide
details for inspection procedures.

Chapter 5 specifically requires facilities, operations, or
work sites to be inspected formally by a safety inspector
annually via a comprehensive survey of all or part of a workplace

29

to detect safety and health hazards completed with sufficient
resources; a presentation of potential solutions for hazardous
conditions, with documented inspections and follow-up inspections
sufficient to determine that hazardous conditions or work
practices have been corrected; within fifteen calendar days of
completion of a formal safety inspection a written notice where a
hazardous working condition exists, identifying its location,
nature, and extent as well as whether it is an imminent danger,
serious violation, or non-serious violation; and establishment of
a time for abatement (immediately for imminent dangers, five
working days for serious dangers, and fifteen working days for
non-serious working days, and further, for imminent dangers work
stoppage and evacuation, as well as preparation by the
establishment manager of an abatement plan if abatement is not
possible within fifteen calendar days). Formal inspections should
be conducted by inspectors qualified to recognize and evaluate
hazards of the working environment and suggest general abatement
procedures; informal inspections are to be conducted by managers
and employees with sufficient training or experience to evaluate
the hazards and suggest abatement. Informal inspections are to be
performed with reasonable frequency.

These procedures are general and permit discretion with
respect to the frequency of inspections, the process of
inspection, and the determination of the presence and severity of
dangers. These procedures also appear to apply primarily to the
workplace, and to facilities or operations, as distinct from the
natural landscape in general.

Chapter 22 also mentions investigating and reporting public

safety-related accidents, requiring all accidents to be
investigated to an extent reflecting the seriousness of the
accident or potential for reoccurrence, and to be reported, and
mandating that a board of inquiry review all accidents resulting
in death. Program responsibilities include placing on employees,
and specifically the park safety officer, the responsibility to
identify hazards within NPS areas that may cause injury, illness,
death or property damage to park visitors and their property, and
identifying any additional signs needed in the park area and
advising management and assisting in preparation of safety
messages to be included in park/area brochures or interpretive
programs. It also states that employees should be able to impart
accurate information to the public about locations, activities,
climate and special environmental threats. Chapter 22 refers to
chapter 6 for details for accident investigation and reporting.
The superintendent of the park is responsible for establishing a
public safety program, which should include all of the above-
mentioned requirements.

Tollefson admitted that NPS-50 provided guidance regarding
warnings and closures in the park setting by providing for
periodic inspections and immediate corrective action for imminent
hazards. (Id. at 3.) Professor Brooks declared that 1999 NPS
policies regarding safety determinations and warning or notice of
known hazardous situations were not matters of weighing and
balancing policy considerations, but rather were made by
reference to mandatory and established policies and according to
scientific investigation of causes, potential for harm, and
degrees of risk; although there may have been discretion as to

1  decide how to warn, the duty to warn and give notice in some form
2  was a mandatory duty of the NPS staff in the local area. (Decl.
3  at 5.) He referred to NPS-50, chs. 5 and 22, and OSHA
4  regulations. Defendant objects that his conclusion that it was
5  not a discretionary decision lacked foundation and was
6  unsupported by evidence; further, it is a legal conclusion. When
7  viewed in light of the following paragraph in the declaration,
8  which identifies the policy relied upon, it is not without
9  foundation; and it appears to constitute an opinion regarding the
10 operative interpretation of those policies from a park manager's
11 point of view and thus within the scope of Brooks' expertise as a
12 professor of park and natural resource management and manager of
13 the operation of the developed recreation resources on the Lassen
14 National Forest from 1984 through 2004. However, to the extent
15 that it approaches a legal conclusion regarding the mandatory or
16 discretionary nature of the operative policies, it is noted that
17 it is for the Court to draw the legal conclusions.

18     Plaintiffs argue that the area in which decedent was killed
19 was closed and then reopened after the May 1999 rock fall, just a
20 few days before decedent's death. Further, Plaintiffs argue that
21 in improving the top of Glacier Point, the park failed to use
22 geological researchers and thus failed to use accepted
23 professional standards in developing its improvements on top of
24 Glacier Point by failing to inspect, identify hazards, abate
25 them, develop the mandated early warning system, otherwise give
26 notice or warning of recognized hazards to employees and
27 visitors, or otherwise implement the studies and monitoring for
28 safety imposed by the RMP and all other standards referred to

hereinabove, and failing to follow accepted professional standards in making the safety determination to reopen Glacier Point and Camp Curry after the May 1999 rock fall that occurred in the same place that killed decedent. (SOF 11-13, 67-68.)

Plaintiffs' evidence tends to show that between two expert park managers there are differing understandings of the nature of the policies, and different understandings or results with respect to the process of making determinations regarding the presence of rock fall hazard and notifying the public of it. The evidence does not tend to show that the policies themselves are mandatory or specific such that it has been established that Defendant violated a mandatory, specific policy with respect to assessing the danger from rock fall and warning the public of it at the time of decedent's death.

With respect to the coverage or applicability of OSHA, Defendant submitted the declaration of Lloyd Olson, who was the YNP safety and occupational health manager/park safety officer from December 1996 through August 1999; as safety officer, his duties included managing the Safety and Occupational Health program for federal employees located in the park, including providing and implementing a comprehensive safety management program for all national park service employees that was in compliance with applicable OSHA regulations. He states:

> The OSHA regulations apply only to employer's responsibilities to provide their employees with safe workplaces and do not apply to private individuals or visitors to the Park. Instead, injuries and fatalities to visitors were managed and investigated by Law Enforcement personnel in the Visitor and Resource Protection Unit.

(Decl. at 1-2.)

Plaintiffs rely on NPS-50, Chapter 5, which provides that 29 C.F.R. part 1960 is the legal authority underlying it, and it further states:

> Program Objectives: This chapter details the minimum requirements for conducting both formal and informal inspections of all NPS establishments and for the timely abatement of identified hazards. By applying the requirements of this chapter to NPS facilities, site managers will ensure compliance with established safety and health codes, thus producing a safe and healthful work environment....

(NPS-50, Ch. 5, page 1.) Chapter 5 further provides:

> Program Requirements: Every NPS facility, operation and/or worksite, including employee housing, shall be formally inspected annually. More frequent inspections will be conducted when there is an increased risk of accidents...The term "inspection" means a comprehensive survey of all or part of a workplace in order to detected safety and health hazards.

(Id.)

With respect to hazards, chapter 5 specifically identifies three categories of hazards and time frames within which to abate each. The various types of hazards are defined by 29 C.F.R. § 1960.2, including imminent danger (conditions or practices in any workplace such that a danger exists which could reasonably be expected to cause death or serious physical harm immediately or before the imminence of such danger can be eliminated through normal procedures) (u)), and serious hazards (hazard, violation or condition such that there is a substantial probability that death or serious physical harm could result) (v). A "workplace" is a physical location where the agency's work or operations are performed." Plaintiffs note that NPS-50, chapter 5, requires notices to be posted within thirty days of completing a formal occupational health inspection or within fifteen calendar days of

1  a formal safety inspection, with prescribed information as to the
2  hazard and abatement thereof; the manager "will initiate"
3  protective action at once for imminent dangers and "should"
4  prepare an abatement plan. (Id., ch. 5 at pp. 5-6.)

5      Plaintiffs also assert that chapter 5 of NPS-50 identifies
6  safety and health inspectors who are to be qualified to perform
7  safety inspections and reviews, and it refers to the OSHA
8  regulations governing the identification and abatement of
9  workplace safety issues as its legal authorization. 29 C.F.R.
10 part 1960.

11     Plaintiff argues that by virtue of the NPS-50, chapter 5,
12 and OSHA regulations definitions of "workplace," the federal park
13 employees' workplace includes the area in and around Camp Curry
14 at the base of Glacier Point, which includes residences used by
15 visitors and employees, areas requiring maintenance and
16 patrolling, and park facilities used by park staff. Further, this
17 area is in the "rock fall zone" recognized in the 1980 General
18 Management Plan, an area for which reports of hazard were made to
19 NPS staff by a federal employee, the USGS geologist working with
20 NPS, and private geologists. Plaintiffs argue that pursuant to 29
21 C.F.R. § 1960.19, which provides that where employees of
22 different agencies engage in joint operations, the standards
23 adopted by the host agency shall govern, the NPS standards
24 govern.

25     Additional specific policies that Plaintiff argues are
26 mandatory include NPS-50, Chapter 22, in which the program
27 objectives state:

28     This chapter specifies the minimum program requirements

1   for protecting the visiting public from recognized
2   hazards related to Department and National Park Service
    (NPS) facilities or operations.

3   (NPS-50, ch. 22, p.1.) However, these provisions are not

4   reasonably interpreted to apply to recreational activities at

5   rock faces, which are not NPS "facilities or operations." This is

6   confirmed by the description of the "Program Requirements," which

7   are that the NPS should establish a public safety program that

8   minimizes the potential for injury, illness, death and/or

9   property damage to the public "while they are visiting NPS

10  facilities." (Id.)

11      Further, even if the scope of the chapters were amenable to

12  Plaintiffs' argument, the terminology in chapter 22, and the

13  substance of chapter 5, are not mandatory because terms such as

14  "should" are used in referring to what employees should do. The

15  discretionary nature of these provisions has been recognized.

16  Blackburn v. United States, 100 F.3d 1426, 1431-32 (9th Cir. 1996)

17  (holding that NPS-50's policy to identify hazards in the park

18  environment to protect park visitors from accident or illness,

19  give adequate warning or alternative action, provide for the

20  health and safety of the public from recognized hazards of NPS

21  operations, lands, and facilities, conduct inspection and hazard

22  abatement (NPS-50, ch. 5), and specifically to undertake

23  corrective action once a hazard or potential hazard was

24  identified, were discretionary and not mandatory).

25      In Summers v. United States, 905 F.2d 1212 (9th Cir. 1990),

26  the court held that NPS's failure to warn visitors to a beach of

27  the concealed danger of hot coals in a fire ring was not subject

28  to the discretionary function exception because it was not a

36

policy decision under the second prong of the analysis; the Summers court also stated that because the danger had not been a known danger, the NPS had not violated its mandatory duty to take corrective action once the hazard was known. The court in Blackburn specifically disavowed this part of Summers, stating that the conclusion in Summer that NPS manuals or guidelines mandated corrective action once a hazard is identified was dictum and was inconsistent with the court's holdings in Childers, and Valdez, 56 F.3d 1177 (holding that the discretionary function exception applied to the NPS's decision not to bring a natural hazard to the attention of the public).

Plaintiffs also rely on NPS-50, chapter 22, "G. Educational Materials, Signs, Programs," where it is stated:

> [A]ll areas will provide any special materials, signs and programs to alert the public of potential dangers.

Likewise, under "Program Responsibilities: E. Park Safety Officer," the description of the officer is:

> 1. Is responsible for identification of hazards that have potential to cause injury, illness, death or property damage to park visitors.

Various methods of bringing information to the public regarding potential dangers are mentioned as possible or good methods of warning the public, and it is stated what brochures and interpretive programs "should" contain. (Id., items 1-5.) These provisions, and provisions that safety officers should review signing to see if it is appropriate, have also been held to be discretionary because they are policy guidelines that outline general policy goals regarding visitor safety but retain discretion in the staff to determine how to meet the goals.

1  <u>Valdez v. United States</u>, 56 F.3d 1177, 1180 (9th Cir. 1995). In

2  rejecting the assertion that the Management Guidelines' broad

3  mandate to warn the public of special hazards through various

4  means was mandatory, the court stated:

5          Because the NPS cannot apprise the public of every
           potential danger posed by every feature of the Park,
6          a degree of judgment is required in order to determine
           which hazards require an explicit warning and which
7          hazards speak for themselves.

8  56 F.3d at 1180.

9          Pursuant to the authority of these cases, the Court

10 concludes that the provision that park superintendents implement

11 program requirements, participate actively in providing for the

12 safety of the public, secure appropriate safety and health

13 training for employees, monitor operations and activities,

14 inspect areas for hazards (NPS-50, ch. at p. 7), and abate as

15 soon as possible are not mandatory provisions requiring specific

16 action by park management.

17                 5. <u>OSHA and Executive Orders regarding Employees</u>

18        Plaintiffs rely on Executive Order 12196 (Decl. of Crabtree,

19 Ex. U), which provides that the head of each agency shall furnish

20 to each employee employment and a place of employment which are

21 free from recognized hazards that are causing or are likely to

22 cause death or serious physical harm.

23        Plaintiffs further rely on OSHA regulations that require,

24 pursuant to Executive Order 12196, that safety inspectors be

25 qualified, have the competence to recognize hazards, require at

26 least annual inspections to identify hazards, define hazards and

27 inspections, require a response to employee reports of hazards,

28 and effectuate abatement of hazards, including plans, reports,

1  and interim protective measures. <u>See</u> 29 C.F.R. §§ 1960.2(k),

2  1960.8, 1960.25(a), (c), 1960.28(d)(3)-(4), 1960.30.

3       In relying on the OSHA standards, Plaintiffs cite to <u>Marlys</u>

4  <u>Bear Medicine v. United States</u>, 241 F.3d 1208, 1215 (9th Cir.

5  2000), in which it was held that the discretionary function

6  exception did not apply to a claim for wrongful death of a worker

7  predicated on negligent supervision of the safety of contract

8  logging operations. The Court reasoned that OSHA standards and

9  mandatory standards of the BIA manual, which required regular

10 inspections and a safe workplace, were applicable and mandatory

11 because the work contract provided that the operation would

12 comply with federal law. The other case cited by Plaintiffs, and

13 mentioned in <u>Marlys Bear Medicine</u>, namely, <u>Camozzi v.</u>

14 <u>Roland/Miller and Hope Consulting Group</u>, 866 F.2d 287 (9th Cir.

15 1989), also involved a suit by an employee of a contractor with

16 the federal government in which the contractor was required to

17 comply with safety standards at a postal facility. Plaintiffs

18 cite no cases applying OSHA standards to suits involving a

19 decedent who was not an employee of the government or of a

20 governmental contractor.

21      The declaration of Lloyd Olson, YNP safety and occupational

22 health manager/park safety officer in June 1999, establishes that

23 in practice, at least, the OSHA regulations applied only to the

24 employer's responsibilities to provide employees with safe

25 workplaces, not to visitors to the park.

26      The mere existence of another standard applicable to

27 employees who might be present in the same area does not

28 supercede other policies pertinent to the public or automatically

1  divest the NPS of what is otherwise a discretionary function with
2  respect to the use of the park by the public. Otherwise, there
3  would be no purpose in articulating separate policies or
4  regulations for workers and the public. Plaintiffs' reliance on
5  workplace guidelines and reporting standards, and on policies to
6  train staff to recognize unsafe and unhealthful work practices
7  and conditions, take corrective actions, and to follow safety
8  work rules and procedures, are not relevant to the decision-
9  making process of the NPS with respect to the public. Whalen v.
10 United States, 29 F.Supp.2d 1093, 1097. Further, there is no
11 indication that any of the provisions of the NPS-50 regarding
12 inspection and abatement (chapter 5) or those respecting
13 investigation and reporting of accidents in the park (chapters 6
14 and 7), are mandatory and specific as to any particular hazard,
15 as distinct from mere recommendations for ameliorating the risk
16 of harm. Whalen, 29 F.Supp.2d at 1097. Plaintiffs have not
17 established that the provisions of the NPS-50 set forth
18 mandatory, specific policy provisions which divested the NPS of
19 discretion, and they have not established that the OSHA or
20 executive standards apply to the Defendant's action with respect
21 to the public visitors of the park.

                          6. 1993 RMP

23    Plaintiffs rely on the 1993 Resource Management Plan (RMP)
24 for YNP adopted December 31, 1993.

25    The 1993 RMP provides:

26    Mitigation: Avoid placement of facilities... and trails in
      known areas of high hazard due to rockfalls, mud and debris
27    flows, and in flood hazard zones.
      ...
28    In development zones, construct and maintain catchments

                               40

and other appropriate structures to mitigate geologic
hazards.
Protection: Implement and maintain remote sensing
and other early warning systems to alert park
populations of impending hazardous conditions.
...
Education: Within one year, develop and
implement parkwide a geologic hazards education program,
including familiarizing park populations with early
warning systems and response procedures.
Research: Develop geologic hazard predictive model
and produce hazard probability map for the GIS.

(Watts Decl., Ex. E, at 4-9.)

Plaintiffs submit evidence tending to show that the area
where decedent was killed was in a rock fall zone sufficiently
hazardous to require removal of cabins pursuant to the Yosemite
General Management Plan of 1980. (Watts. Decl., Ex. C.) Despite
NPS's own USGS geologist's having given NPS notice of the
hazardous condition of Glacier Point, Defendant did not warn of
the general hazard of rock fall in the area, the specific hazard
of major rock fall events in the magnitude of many tons, or
engage in the monitoring and study or the creation of an early
warning system mandated by the 1993 RMP. (Watts Decl., Ex. E.)

Brooks declares that if the 1999 YNP superintendent's
compendium, as specified in Title 36 of the CFR,[7] had been
completed as required, it would have identified that rock fall
hazard from Glacier Point, and all actions required by NPS-50
(signage, notice, or closure) would have occurred. (Decl. at 18.)
Defendant objects that this is irrelevant, speculative, lacking
foundation as to what the document would have identified as a
hazard and what it might have done, and assumes facts not in

_____

[7] The Court's invitation at argument for specific references to portions of that title did not result in clarification of this point.

41

evidence. Defendant's objections are sustained.

Plaintiffs rely on the Resource Management Plan approved by the NPS and YNP management in 1993 (RMP 1993, Decl. of Watts, Ex. E.) That plan established that the park would study and monitor rock fall and geologic hazards and establish an early warning system in the interest of visitor safety.

Reference to the 1993 RMP reveals that although plan elements and formats are prescribed, there is no specific time table for the performance of the resource management study or plan; only the educational component is subjected to a time limit, but it does not necessarily mandate that early warning systems and responses be fully developed. Further, the terms of the document are general and not specific ("Avoid placement of facilities... in known areas of high hazard due to rockfalls," "Continue the inventory and mapping of geologic hazards near developed areas and access corridors (systematic mapping and rating system," "Park rockfall hazard zones...need to be digitized for input to the GIS.") It does not appear that any of these provisions mandated specific action to be taken with respect to warning of the danger of rock fall on Glacier Point at the time of decedent's death.

### 7. 1988 NPS Sign Manual

Tollefson states that the placement and use of signs in YNP is governed by the NPS Sign Manual, adopted January 1988 (1988 NPS Sign Manual), which governs the use and placement of signs, and gives discretion to individual NPS park managers to determine, in their professional judgment, drawing upon available guides, resources, and traffic safety engineering expertise, and

considering a variety of other factors, such as the appearance of
the road as a whole and its relationship to the natural and/or
historical environment through which it passes, whether a sign is
necessary or appropriate at a given location, and where and what
signs to place to insure minimal intrusion upon the natural and
historic setting of parks. (Decl. at 2-3, Ex. B at 1-1.)
Reference to the 1988 NPS Sign Manual reveals that it is designed
as an aid to implementing the NPS Traffic Control Sign System
Guideline "and in arriving at management decisions regarding
other park signing needs." It was intended for managers to use
the manual as a guide in designing and ordering all vehicular and
pedestrian traffic control signing and other pertinent devices,
and it was intended to assume uniform and distinctive signing and
graphics in obligations under the Highway Safety Act of 1966. It
states that the park manager has the responsibility to determine
whether a sign is necessary or appropriate at a given location,
following the guidelines and procedures set down in NPS-52 (the
National Park Service Traffic Control Sign System Guideline). It
states:

> It is important in this regard, too, that such decisions
> bear in mind long standing NPS policy to minimally
> intrude upon the natural or historic setting in
> National Park System areas, and to avoid an unnecessary
> proliferation of signs, while striving to ensure for
> the safety of park visitors.

(Id. at 1-1.)

The provisions of the 1988 MP regarding signs are previously
set forth and reveal a strong discretionary component with
respect to the choice of using signs and the placement and nature
thereof.

43

It has been held that the NPS sign manual was a component of an area plan that revealed a larger policy requiring the weighing of public access and visitor safety considerations. <u>Childers v. United States</u>, 40 F.3d 973, 975. Here, the sign manual clearly grants the discretion to balance safety, environmental, and aesthetic concerns to park managers, and it is reasonable to interpret is as a part of the larger set of policies previously discussed which likewise state overarching policy goals (access, preservation, visitor safety) which nevertheless rest considerable discretion in park staff to balance the competing considerations. <u>Whalen</u>, 29 F.Supp.2d 1093, 1097-98. The process of identifying hazards, determining which require an explicit warning, and deciding the precise manner in which to warn is a discretionary process. <u>Blackburn</u>, 100 F.3d at 1431. The NPS Sign Manual permits discretion regarding resource allocation, visitor access, and visitor safety in the decision to warn. <u>Kahan v. United States</u>, 73 F.Supp.2d 1172, 1177 (D.C.Hawaii 1999).

Plaintiffs also argue that even if Defendant had discretion to decide whether to post signs or what type/color to post, or to put warnings in brochures or boards, nevertheless, once Defendant became aware of a recognized hazard, it had a mandatory duty under the above-mentioned policies to investigate the workplace, abate it or protect workers and visitors, and give some type of notice and warning. Plaintiffs argue that Defendant simply ignored the mandatory duty to provide a safe workplace or warn; it did not exercise discretion as to how to do it, but rather just ignored it. However, it is undisputed that after the May 1999 rock fall, Defendant's staff did investigate the area,

warned and closed it briefly, and then reopened the area after apparently determining that no warnings were necessary any longer.

Further, the more fundamental defect with Plaintiffs' argument is that the decision cannot be boiled down to a simple recognition of the existence of some hazard. The entire process, including identifying hazards, determining which hazards require a warning, and determining how and when and where the warning should proceed, involves discretion. Although there is evidence that would support an inference that there was a known danger of rock fall at the Glacier Point site, there is no way to determine what standard to use to evaluate any duty to provide a warning at the particular time of decedent's death, how much evidence to require pursuant to such a standard before a duty is clear, or what type of warning was required. Although it is tempting to posit that some duty existed because there was some knowledge of a hazard, how should that hazard have been evaluated? Questions of how extensive and imminent and certain a hazard must be before a warning is issued are presented; there follow questions regarding the type of warning to be given. These questions are at the core of the discretionary function articulated in the policies. Plaintiffs have not shown that a specific, mandatory policy existed that created a duty to provide some warning, as distinct from no warning, at any specific point in time or space after the May 1999 rock slide. In Blackburn, the court recognized that its holding in Summers that guidelines somehow mandated action was inconsistent with the holdings in Valdez and Childers, which involved known hazards but yet determined that the

45

1   discretionary function exception applied. 100 F.3d at 1432.

2                8. <u>1989 Wilderness Management Plan</u>

3       It is undisputed that the 1989 Wilderness Management Plan of

4   1989 quotes the 1988 MP to the effect that the visitor to a

5   wilderness area must accept the wilderness largely on its own

6   terms and must accept the risks of wilderness travel, possible

7   dangers from accidents, wildlife, and natural phenomena as part

8   of the wilderness experience; however, it also states, "Beyond

9   notifying and warning of obvious or hidden hazards, the National

10  Park Service leaves wilderness users to assume most of the

11  responsibility for their own safety." It also provides that the

12  NPS will provide educational and interpretive media and programs

13  which will ultimately promote wilderness safety, and it will

14  enhance public safety through the use of safety warnings. (Brooks

15  Decl. ¶ 16, Ex. C at 12, 14.)

16      It is not clear that this applies because the location of

17  the decedent at the time of death has not been established.

18  However, the terms of this policy are extremely broad, not

19  specific and mandatory.

20            9. <u>1988 MP re: Wastewater Facilities</u>

21      Tollefson declares that the 1988 MP (Decl. at 3, Ex. C)

22  include general policies for facility development and placement,

23  including wastewater treatment facilities. The MP state that

24  development of facilities to serve users will generally be

25  avoided, but campsites may be designated when essential for

26  resource protection or enhancement of opportunities for solitude,

27  and may include a toilet if determined by the superintendent to

28  be the minimum facilities necessary for the health and safety of

                                  46

1  wilderness users or for the protection of wilderness resources
2  and values. Toilets will be placed only in locations where their
3  presence and use will resolve health and sanitation problems or
4  prevent serious resource damage and where reducing or dispersing
5  visitor use has failed to alleviate the problems or is
6  impractical. (Ex. C, ch. 6:6.)

7      Further, in chapter 9, the 1988 MP states that the NPS will
8  provide appropriate facilities necessary for resource protection
9  and required for visitor enjoyment of parks that will be
10  harmonious with park resources, compatible with natural
11  processes, aesthetically pleasing, functional, energy-efficient,
12  cost-effective, and as accessible as possible to all segments of
13  the population. (Ex. C, ch. 9:1.) As to location, it states that
14  major facilities within park boundaries will be placed only in
15  development zones established by the parks' approved general
16  management plan; facilities will be integrated into the park
17  landscape and environs as to cause minimum impact and will not
18  compete with or dominate park features. Full integration
19  involves, among other things, sensitivity to cultural, regional,
20  aesthetic, and environmental factors in the selection of the
21  site, materials, and forms. It also states:

22      Facilities will not be located in areas where natural
        processes pose a persistent threat unless no practicable
23      alternative site exists and unless all safety and
        hazard probability factors have been considered. Hazardous
24      areas include sites with unstable soils and
        geologic conditions.... Where facilities must be
25      located in such areas, their design and siting will consider
        the nature of the hazard and include appropriate mitigating
26      measures to minimize risks to human life and property.

27  (Brooks Decl., Ex. A, ch. 9:2-3.)

28      Further, MP 1988 provides that when there is thought to be a

47

1 potential for resource impairment, actions will be based on
2 strategies that retain the resource in an unimpaired condition
3 until doubts are resolved; if a development might impair a park
4 resource, the development will be postponed or reconfigured until
5 it can be established whether it will or will not within
6 reasonable limits of certainty; absent that assurance, the action
7 will not be taken. (Id. at ch. 1:4.)

8     Plaintiffs characterize the policies in MP 1988 regarding
9 siting facilities as mandatory; then Plaintiffs point to evidence
10 (Watts Decl. ¶ 20, Crabtree Decl., Ex. A, Dep. of Wieczorek of
11 June 8, 2005, at p. 75) that rock fall hazards associated with
12 wastewater management at the top of the geologic formation were
13 not taken into account. However, the policies appear to be
14 discretionary because whether a natural hazard exists requires a
15 decision by park management, and due to the scope of the geologic
16 hazard in the park, to decide where to place facilities requires
17 a balancing of factors. It appears that the decision to place
18 facilities is discretionary in nature because the decision
19 requires a balancing of policy considerations.

20     As to wastewater treatment systems, it prohibits new
21 wastewater treatment plants or enlargement of existing plants
22 until it has been determined that reductions in water use are not
23 possible. It states:

24     In selecting an appropriate method of wastewater treatment,
    the factors of all-season reliability, cost-effectiveness,
25     and minimum adverse impact on the environment will all
    be considered. Wastewater will be adequately treated so that
26     on its return to water courses it meets or exceeds
    applicable state and federal water quality standards.
27
28 (Id. at 9:5.)

48

1    Tollefson also declares that the Yosemite Valley Plan (YVP),
2  adopted in November 2000 (almost a year and one-half after the
3  decedent's death), provides expressly that decisions about
4  locating and relocating facilities are an exercise of discretion
5  based on various specified policy factors; geologic processes,
6  such as mass movement and rock fall, shall proceed unimpeded
7  despite exposure of some facilities in the Yosemite Valley.  The
8  mere fact that it reflects a set of criteria does not seem to
9  support an inference that deliberations regarding those criteria
10 occurred before the plan was adopted.

11   Plaintiffs object to the YVP as irrelevant. Because it post-
12 dates decedent's death, and because there is no foundation
13 establishing a basis for relevance to the time of the decedent's
14 death, it does not immediately appear to be relevant.

15   The policies concerning the siting and maintenance of
16 wastewater facilities state broad policy objectives and refer to
17 competing policy considerations. There is no mandatory, specific
18 policy that required particular action of any NPS agent in
19 connection with the death of decedent.

20   NPS-50 provides that the associate director of operations
21 establishes a procedure for conducting engineering reviews of
22 major construction and alteration projects. (Ch. 1, p. 3.) This
23 provision does not impose a mandatory, specific duty with respect
24 to visitor safety.

25   Plaintiffs argue that this case is unique in that the
26 government's wastewater facility is alleged to have contributed
27 to the natural hazard involved. However, to the extent that it is
28 involved at all in the first prong of the analysis, the fact that

1  the government's proprietary activity of building and operating a
2  wastewater facility, which was artificial, on the land and
3  thereby possibly contributing to the cause of the rock fall,
4  should not distinguish this case from the cases discussed herein.
5  In both <u>Valdez</u> (government made and maintained the trail) and
6  <u>Blackburn</u> (government constructed the bridge and put up some
7  signs), the government's own conduct created or contributed to
8  the hazards.

9       In summary, the Court concludes that Plaintiffs have not
10 established a specific, mandatory policy regarding identifying
11 and warning decedent or other visitors of rock fall hazard at the
12 time of decedent's death.

13              C. <u>Policy Decision</u>

14      It must be determined whether or not the government's
15 investigation, analysis and determinations regarding the hazard
16 and warning were subject to policy analysis or consideration. It
17 must be determined whether there was a government action
18 involving the exercise of policy judgment or choice, susceptible
19 to policy analysis, involving a decision grounded in social,
20 economic, and political policy.

21      Plaintiffs argue that because in the 1980 GMP the NPS had
22 already determined that the area below Glacier Point near Curry
23 Village was a recognized hazard, and because in the 1993 RMP the
24 NPS had already determined that geologic study, monitoring, and
25 early warning system were necessary to protect persons in the
26 park, the NPS had a duty to act. Further, the safety
27 determinations and scientific investigations required under the
28 1988 Management Policies, the 1993 RMP, NPS-50, OSHA, and

1  Executive Order 12196 were not discretionary; no balancing of
2  policy considerations remained to be performed. The only duty was
3  the mandatory duty to make safety and scientific determinations
4  necessary to protect human life and prevent injuries.

5       It has been held that what constitutes adequate warning is
6  not typically related to broad public policy, and where a safety
7  plan does not give the option of doing nothing, a failure to warn
8  involves considerations of safety and not policy. <u>Faber v. United
9  States</u>, 56 F.3d 1122, 1124-26 (9th Cir. 1995) (failure to follow
10 an established plan required implementation of specific safety
11 measures); <u>Sutton v. Earles</u>, 26 F.3d 903, 910 (9th Cir. 1994
12 (failure to warn of known water hazard held not a policy
13 decision). Further, a failure to adhere to accepted professional
14 standards is not susceptible to a policy analysis. <u>ARA Leisure
15 Services v. United States</u>, 831 F.2d 193, 195 (failure to maintain
16 road in safe condition not protected under discretionary function
17 exception because the conduct involved safety considerations
18 under an established policy rather than competing public policy
19 considerations); <u>Arizona Maintenance Co. v. United States</u>, 864
20 F.2d 1497, 1502-05 (9th Cir. 1989) (failure to implement
21 established, objective industry standards for the amount of
22 dynamite used in blasting canals held not to involve policy
23 considerations); <u>O'Toole</u>, at 1037 (failure to perform required
24 maintenance not policy-oriented); <u>Chaffin v. United States</u>, 176
25 F.3d 1208 (9th Cir. 1999) (triable issue of fact existed as to
26 whether the government had superior knowledge of the risk of harm
27 from polar bears and failed to reduce the risk).

28      However, where the policy in question permits the government

51

1  agent to exercise discretion, the very existence of the
2  discretionary policy creates a strong presumption that a
3  discretionary act authorized by the policy involved consideration
4  of the same policies which led to the promulgation of the policy.
5  Gaubert, 499 U.S. at 324 (concerning a regulation permitting
6  discretion).

7       Plaintiff has produced evidence of two relatively recent
8  rock falls on Glacier Point, preceding decedent's death by months
9  and weeks, respectively. Plaintiff has provided expert opinion
10 that previous rock falls are important factors in prediction of
11 future rock falls and that wastewater from the government's
12 facility probably contributed to the rock fall that killed
13 decedent. This evidence warrants an inference that some factors
14 important to prediction of future rock falls were present.
15 However, in view of the nature of the hazard, the apparent
16 difficulty of prediction of rock falls, and the setting of the
17 hazard in a national park in which rock fall hazard abounded, it
18 is concluded that even though a reasonable person might have
19 apprehended a danger of rock fall at some unknown point in the
20 future, and thus a safety concern was present, Plaintiff's
21 evidence is not sufficient to overcome the presumption that the
22 discretionary act authorized by the policy involved the relevant
23 competing policy considerations. The government's decision
24 regarding assessment of the danger of rock fall and of the need
25 to protect or warn the public was not a case of routine
26 maintenance, or of objective, established safety standards which
27 were required to be implemented. Instead, the decision appears to
28 have been clearly linked to considerations of not only safety,

1 but also public access to natural resources and conservation of
2 the natural environment. <u>Cf. Childers</u>, 40 F.3d at 975-76. <u>Summers</u>
3 should not be read too broadly so as to exclude all decisions
4 involving a safety concern from the range of public policy.
5 <u>Valdez v. United States</u>, 56 F.3d 1177, 1180. Here, the nature of
6 the government's action involved considerations of maximizing
7 access to the rock face for recreational use, judicious use of
8 signs in an area riddled with almost limitless hazards and many
9 obvious dangers, and competing concerns regarding the need to
10 minimize potential safety hazards. Here, as in <u>Valdez</u>, <u>Blackburn</u>,
11 and <u>Whalen</u>, managing public access to resources, identifying the
12 nature and extent or imminence of the hazard, and determining the
13 need for warning or other protection constitute actions
14 susceptible to policy analysis.

15         D. <u>Conclusion</u>

16     The Court rejects Plaintiffs' assertion that if this action
17 is dismissed, this Court will fall into the trap identified in
18 <u>O'Toole</u>, 295 F.3d 1029 (holding that an agency's decision to
19 forego routine maintenance on an irrigation system for fiscal
20 reasons was not the type of policy decision protected by the
21 discretionary function exception), namely, to permit the
22 discretionary function exception to swallow the FTCA where the
23 government acts in the role of a private landowner. The present
24 case did not involve a routine decision regarding maintenance.
25 Further, it was not a simple failure to perform a mandatory duty
26 under an established, specific policy or pursuant to scientific,
27 objectively determinable standards. The Court is not guided by
28 <u>Smith v. United States</u>, 546 F.2d 872, 876-77 (10th Cir. 1976)

1  (holding that the failure to warn of thin earth crusts near a
2  thermal pool, where there were warnings about such hazards posted
3  in other locations, was not a discretionary decision linked to
4  the decision to keep the area underdeveloped), in which the court
5  declared that the decision of the government, as a landowner, not
6  to warn of known dangers or to provide safeguards cannot
7  rationally be deemed discretionary. The Tenth Circuit courts have
8  since recognized that the government's status as landowner does
9  not create a special type of discretionary function case, and
10 that where the decision not to place warnings is part of some
11 overall policy, the discretionary function exception applies.
12 See Zumwalt v. United States, 928 F.2d 951, 953-56 (10th Cir.
13 1991) (decision not to mark a trail at a national monument in a
14 wilderness area held to be discretionary where the pertinent
15 policies provided that park personnel would first determine which
16 sections of the trail were hazardous, without directions on how
17 to make the determination, and where it was part of an overall
18 decision to maintain the area in a wilderness state). This case
19 is more like Childers v. United States, 40 F.3d 973, 975, where
20 the action taken was part of an overall plan involving public
21 policy considerations. In the unique circumstances of the present
22 case, there is a clear connection between the discretionary
23 policy considerations and the action undertaken.

24     Accordingly, it is concluded that Defendant has shown that
25 the discretionary function exception to the waiver of immunity
26 applies. Plaintiffs have not shown that the Court has subject
27 matter jurisdiction.

28     It does not appear that any amendment of the complaint has

1  been suggested by Plaintiffs, would be appropriate, or would
2  change the Court's analysis. Thus, Plaintiffs' request to be
3  permitted to amend the complaint will be denied.

4       Defendant's motion to dismiss for lack of subject matter
5  jurisdiction will be granted.

6       VI. <u>Assumption of the Risk</u>

7       With respect to assumption of risk, because the Court lacks
8  subject matter jurisdiction over this action, the Court lacks
9  jurisdiction to consider or grant Defendant's motion for summary
10 judgment on the grounds of assumption of the risk. <u>California</u>
11 <u>Save Our Streams Council, Inc. v. Yeutter</u> 887 F.2d 908, 912-913
12 (9th Cir. 1989). Defendant's motion is moot. The appropriate
13 remedy is to order the action dismissed. <u>Id.</u>

14      Accordingly, it IS ORDERED that

15      1) Defendant's motion to dismiss this action pursuant to
16 Fed. R. Civ. P. 12(b)(1) IS GRANTED,; and

17      2) Plaintiffs' request for leave to amend the complaint IS
18 DENIED; and

19      3) Defendant's motion in the alternative for summary
20 judgment or summary adjudication IS DECLARED MOOT; and

21      4) The Clerk IS DIRECTED TO DISMISS this action for lack of
22 subject matter jurisdiction.

24 IT IS SO ORDERED.

25 **Dated:    December 7, 2005**              **/s/ Sandra M. Snyder**
   icido3                          UNITED STATES MAGISTRATE JUDGE